## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Durwin Ellerman, being duly sworn, depose and state as follows:

1. I am currently a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I was deputized as a federal TFO pursuant to 21 U.S.C. § 878 on September 27, 2023, and I am designated by the Attorney General, through approved delegations of authority, to execute and serve search warrants and arrest warrants issued under the authority of the United States. Accordingly, I am serving as a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C). Prior to working as a full-time DEA TFO, I was assigned as a Detective at the Burlington, Vermont Police Department (BPD) since November of 2019. I have been a certified full-time law enforcement officer with BPD since May of 2014.

2. Throughout my assignments, I have investigated or assisted with the investigation of numerous illegal drugs, drug-related devices/paraphernalia and drug-related evidence. I have seized or participated in seizures of different quantities of illegal drugs, controlled substances, user paraphernalia and other assorted items, such as money and property related to or acquired through the drug trade. I have seized or participated in seizures of various types of illegal drugs/narcotics during these investigations, to include powder cocaine, cocaine base, marijuana, heroin, fentanyl, methamphetamine, and numerous types of prescription medications. I have conducted or been involved in multiple drug investigations, and from this experience, I am familiar with the trends associated with the use and distribution of illegal drugs/controlled substances. I have conducted frequent controlled purchases of illegal substances utilizing a confidential source. I have also participated in specialized training in which the primary focus was proactive criminal drug enforcement provided by the Vermont Criminal Justice Training Council. This training taught me interdiction techniques and to identify criminal drug activities.

3. I submit this affidavit to establish probable cause to believe that on a certain date the week of January 1, 2024, and on a certain date the week of January 8, 2024, Jahking Allah, aka "Stop Sign," violated 21 U.S.C. § 841(a)(1) by knowingly and intentionally distributing quantities of cocaine base in the District of Vermont.

4. This affidavit is based upon my training and experience, and the investigation of other law enforcement officers and my own observations and participation in this investigation. This affidavit is submitted for the limited purpose of establishing probable cause, therefore, I have not set forth each and every fact learned by law enforcement during the course of the investigation. Where I describe a statement, it is described in substance, not verbatim.

## Investigation Overview

5. In October 2023, a cooperating subject (CS)[1] informed me that it could purchase "crack" cocaine (cocaine base) from a male known to it by the street name "Stop Sign." CS described "Stop Sign" as a younger light-skinned black male with short braids. CS indicated it only knew "Stop Sign" to sell crack cocaine, charging a known amount of U.S. currency for a known quantity of the drug. CS stated that it had the phone number 802-373-2517 for "Stop Sign."

## Controlled Purchase the Week of January 1, 2024 from "Stop Sign"

6. On a certain date the week of January 1, 2024, CS told BPD Detective Hartnett that it was in a position to purchase crack cocaine from "Stop Sign." CS met with investigators at a known location in Burlington. Investigators completed a search of CS and found no drugs, paraphernalia, or large sums of money.

---

[1] CS had previously entered into a cooperating subject agreement with the Burlington Police Department and agreed to provide active cooperation in exchange for monetary compensation. CS has four criminal convictions for vehicle operation with a suspended license and a criminal conviction for negligent operation.

7.  Prior to meeting with investigators, CS had communicated with "Stop Sign" via 802-373-2517 to confirm that "Stop Sign" was available for the transaction and arrange the purchase of crack cocaine. CS advised investigators it had agreed to purchase a specific quantity of crack cocaine from "Stop Sign." Via text message, CS coordinated to meet "Stop Sign" in the area of City Hall Park in Burlington.

8.  CS was outfitted with an electronic audio/video transmitter device (security body wire) and provided sufficient serialized U.S. currency to complete the transaction. Investigators established surveillance in the area of City Hall Park. CS then separated from investigators and began to travel toward City Hall Park. I and other investigators monitored CS as it traveled to the area of the anticipated transaction.

9.  While separated from investigators, CS had communications with "Stop Sign" where CS was told to meet "Stop Sign" in front of a particular location in Burlington. CS traveled to the area of the location where it met with "Stop Sign," who was in a parked grey Honda Pilot with Massachusetts registration 2EZS81. CS got into the Pilot, which thereafter conducted a short apparently meaningless drive with CS in the vehicle. The Pilot stopped and CS got out of the vehicle.

10.  After exiting the vehicle, CS was monitored by myself and other investigators until it returned to investigators and provided BPD Detective Hartnett the suspected "crack" cocaine it had purchased from "Stop Sign." CS was brought to a known location, again searched, and found not to be in possession of any drugs, paraphernalia, or large sums of money.

11.  CS provided a sworn, audio-recorded statement confirming that while in the vehicle, "Stop Sign" handed it the suspected crack cocaine, and it handed "Stop Sign" the money.

12. The suspected crack cocaine that CS handed Detective Hartnett was packaged consistent with how cocaine base is frequently sold in Burlington, and the suspected cocaine base had a white rock-like substance consistent with cocaine base. The weight of the substance was consistent with the amount ordered by CS and also consistent with the quantity of cocaine base typically obtained with the amount of serialized currency CS had been provided. Detective Hartnett field tested the suspected crack cocaine, which tested presumptive positive for cocaine.

13. After the controlled purchase, I and other investigators monitored "Stop Sign" driving the Pilot. The Pilot, after driving to various locations, was observed parked in front of 195 St. Paul Street, where an individual met with the vehicle on the driver's side. The Pilot then traveled south and was observed meeting with two individuals in the driveway of 230 St. Paul Street. The Pilot then continued driving around the downtown district in a generally circular path of travel.

14. After the purchase, I reviewed video footage captured from the electronic audio/video transmitter device. In the footage, "Stop Sign" is visible in the motor vehicle consistent with the CS's statement.

### Identification of "Stop Sign"

15. On January 5, 2024, a Vermont state search warrant was served on AT&T Wireless, the cellular provider of 802-373-2517. The subscriber information for the number reflected that the number was registered to "ALLAH JA" with an address of 273 Old Colchester Road, Quaker Hill, Connecticut. Using open-source investigative tools, BPD Detective Corporal Beal determined that a male named "Jahking Allah," born in 1979, had previously been a resident of that address, and that Allah had a criminal record in Connecticut.

16. Detective Corporal Beal contacted the Norwich, Connecticut police department and obtained a booking photograph of Allah along with an inmate booking face sheet. Detective Corporal Beal compared the materials sent by the Norwich police department to surveillance images and video of "Stop Sign" and recognized Allah as the individual known as "Stop Sign."

### Controlled Purchase the Week of January 8, 2024 from "Stop Sign"

17. On a certain date the week of January 8, 2024, CS told investigators that it was in a position to purchase drugs from "Stop Sign." Investigators thereafter met with CS and brought CS to the Burlington Police Department.

18. CS was searched and found not to be in possession of any drugs, paraphernalia, or large sums of money. CS provided information to investigators regarding the prices "Stop Sign" was charging for particular quantities of cocaine base.

19. CS then traveled with investigators to an area close to 195 St. Paul Street. At Detective Corporal Beal's direction, CS sent "Stop Sign" a text to the 802-373-2517 number stating that CS was in the area of City Hall Park and wished to conduct a drug transaction. CS received no response to the text message and was instructed by investigators to call "Stop Sign" at the same number. "Stop Sign" answered the call, which was recorded, and instructed CS to meet him at a specific location in Burlington. CS traveled with investigators to an area close to the location.

20. Investigators provided CS with an amount of serialized U.S. currency necessary to complete the transaction and outfitted CS with an audio/video transmitter device (security body wire). CS received a text message from "Stop Sign" via the 802-373-2517 number, directing CS to wait for him at a particular location in Burlington. CS then separated from investigators and

began traveling to the area of the location. CS was monitored through the security body wire throughout the time CS was away from investigators.

21. Approximately 15 minutes later, BPD Detective Sergeant Tremblay observed and video recorded a light skinned black male consistent in appearance with Allah riding a scooter enter a parking lot near the location CS was to meet "Stop Sign." Detective Sergeant Tremblay watched the male approach CS, and I watched and recorded the male make contact with CS. Both CS and the male began walking from the parking lot toward where investigators were located, and they passed by investigators. Detective Corporal Beal observed the CS and the male walking and was able to confirm that the male was Allah.

22. CS and Allah then separated, and CS returned to investigators and provided Detective Corporal Beal the suspected "crack" cocaine it had purchased from "Stop Sign." CS was brought to the Burlington Police Department, again searched, and found not to be in possession of any drugs, paraphernalia, or large sums of money.

23. CS provided a sworn, audio-recorded statement confirming that it purchased the suspected "crack" cocaine from "Stop Sign."

24. The suspected "crack" cocaine was field tested and presumptive positive for cocaine. The suspected "crack" cocaine had a white rock-like appearance consistent with cocaine base. The weight of the substance was consistent with the amount ordered by CS and also consistent with the quantity of cocaine base typically obtained with the amount of serialized currency CS had been provided.

25. After the transaction, investigators saw Allah arrive at 195 St. Paul Street on the same scooter he had been riding at the time of the distribution to CS. Detective Sergeant Tremblay then witnessed Allah enter 195 St. Paul Street, Apartment A.

### January 19, 2024 Search Warrant at 195 St. Paul Street, Apartment A

26. Previously, privately owned cameras in the area showed Allah frequenting the back apartment of 195 St. Paul Street, and phone pings for 802-373-2517 obtained via the above-referenced state search warrant indicated the phone was stationary nightly in the area of the address during the overnight hours. In addition, investigators saw the Honda Pilot known to be used by Allah parked in front of the residence on multiple occasions.

27. On January 19, 2024 at approximately 6:00 a.m., a Vermont state search warrant was executed at 195 St. Paul Street, Apartment A. Allah was located inside the apartment and taken into custody. Among the items seized from the apartment were the following:

   a. Seven firearms, two of which are confirmed stolen;

   b. A total of approximately 85 grams of a white, rock-like substance, some of which field tested presumptive positive for cocaine, from various locations around the apartment;

   c. A total of approximately 25.8 grams of a purple powdery substance, some of which field tested presumptive positive for fentanyl, from various locations around the apartment;

   d. Multiple digital scales with white powdery residue that tested presumptive positive for cocaine; and

   e. The phone corresponding to Allah's 802-373-2517 number. To identify the phone, investigators placed a call to 802-373-2517 and saw the screen reflect the incoming call.

## Conclusion

27. Based on the information set forth above, I believe there is probable cause that Jahking Allah, aka "Stop Sign," violated 21 U.S.C. § 841(a)(1) by knowingly and intentionally distributing a controlled substance, namely cocaine base, in the District of Vermont on a certain date the week of January 1, 2024 and on a certain date the week of January 8, 2024.

Respectfully submitted,

Durwin Ellerman
Task Force Officer, DEA

Sworn to and subscribed before me this 20th day of January, 2024.

Hon. Kevin J. Doyle
United States Magistrate Judge